Filed 6/14/22  P. v. Mendoza CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JESUS LEE MENDOZA,<br><br>Defendant and Appellant. | F081812<br><br>(Super. Ct. No. MCR064935)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Ernest J. LiCalsi, Judge.

Nicholas Seymour, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Darren K. Indermill and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Following a domestic dispute with his partner, Maria R., defendant Jesus Lee Mendoza was charged with two felonies, making criminal threats with an attached sentence enhancement allegation for personal use of a firearm (Pen. Code, §§ 422, subd. (a), 12022.5, subd. (a); count 1),[1] and resisting an executive officer by means of force or violence (§ 69, subd. (a); count 2). The case went to trial and the jury convicted defendant on count 1 of the lesser included offense of attempted criminal threats, convicted him on count 2, and found the sentence enhancement allegation true. The trial court sentenced defendant to the upper term of 18 months on count 1 plus an additional term of 10 years for the firearm enhancement, and a consecutive term of eight months on count 2, for a total determinate term of 12 years 2 months.

On appeal, defendant claims the prosecution failed to make a good faith effort to obtain Maria's presence at trial and, therefore, the trial court erred when it found she was unavailable and permitted use of her preliminary hearing testimony. Defendant also claims the trial court erred when it denied his request to instruct the jury on the lesser included offense of resisting arrest under section 148, subdivision (a)(1). Finally, defendant claims the trial court miscalculated his presentence custody credits; the sentencing minutes and abstract of judgment contain clerical errors requiring correction; and the matter must be remanded for resentencing on count 1 in light of Senate Bill No. 567 (2021–2022 Reg. Sess.), which amended section 1170 effective January 1, 2022 (Stats. 2021, ch. 731, § 1.3) (Senate Bill 567).

The People concede defendant is entitled to recalculation of his credits, to correction of the clerical errors in the minute order and abstract of judgment, and to resentencing on count 1 under Senate Bill 567. They dispute the trial court erred when it

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

found Maria was an unavailable witness and admitted her preliminary hearing testimony or when it declined to instruct the jury on the lesser included offense of resisting arrest.

We conclude that the prosecutor failed to demonstrate he "exercised reasonable or due diligence to obtain [Maria's] presence at trial" (*People v. Sanchez* (2016) 63 Cal.4th 411, 440 (*Sanchez*)), and the trial court erred in concluding otherwise. As Maria's preliminary hearing testimony was critical to the prosecution's case on count 1, the error was not harmless beyond a reasonable doubt and reversal of defendant's conviction for attempted criminal threats is required. However, we reject defendant's claim that the trial court's failure to instruct the jury on the lesser included offense of resisting arrest was erroneous. In light of the disposition on count 1, defendant's request for resentencing under Senate Bill 567 is moot, as is his request for correction of one of the two clerical errors, but, on remand, recalculation of defendant's presentence credits is required, and the trial court shall correct its minute order and forward an amended abstract of judgment omitting the $750 presentence report fee.[2]

## FACTUAL SUMMARY

### I. Prosecution Case

Around midnight in late October 2019, a female called 911, reported a domestic disturbance, and hung up. Madera County Sheriff's Department deputies were dispatched to the residence. Deputy Bangerter, who was in uniform and driving a marked vehicle, arrived first. He proceeded cautiously because it was very dark, and there were several residences and vehicles on the property.

The lights were on in only one house at the rear of the property and Deputy Bangerter heard male and female voices yelling from inside. Bangerter saw a male,

---

[2] Although the trial court did not impose the presentence report fee in this case, section 1203.1b, which authorized the fee, was repealed effective July 1, 2021, and any balance owed became unenforceable and uncollectible effective September 23, 2021. (Assem. Bill No. 1869 (2019–2020 Reg. Sess.); Assem. Bill No. 177 (2021–2022 Reg. Sess.).)

whom he identified as defendant, come outside, look at him, and go back inside the house. Prior to and after seeing defendant, Bangerter announced himself and told the residents to come outside. Bangerter positioned himself behind a vehicle and when a woman, identified as Maria, came out, he directed her to come to him. She complied, he asked if there were any weapons in the house, and she said yes.[3] Bangerter testified Maria's voice and body were shaking, and she appeared scared.

Thereafter, defendant came out of the house a second time. Bangerter had a flashlight and could see there were no weapons in defendant's hands. He called out to defendant, who was speaking in Spanish, although it was unclear to whom. As Bangerter approached, defendant turned and started to retreat toward the house. Bangerter grabbed defendant from behind to prevent him from returning to the house. Defendant turned to face Bangerter, who began to explain why he was there. Defendant was wearing jeans and a loose jacket, and he reached for his front pants pocket. With his right hand, Bangerter grabbed defendant's right hand and told him to stop reaching into his pockets. When defendant tried to step around him, Bangerter readjusted his grip and tried to grab both of defendant's hands. Defendant attempted to pull away. Bangerter told him to stop and asked if he had any weapons, but he did not respond.

Bangerter wrapped his right leg around defendant's legs in an attempt to leg-sweep defendant to the ground. Defendant put his arms around Bangerter's waist and duty belt, although he did not try to remove any items from the belt. Defendant tried to take Bangerter to the ground and Bangerter pushed him to create some space between them. Bangerter was unable to reach the taser on his left side because his flashlight was in his left hand and defendant was pinning his left arm. Using his free right hand, Bangerter struck defendant in the face and head several times, which enabled Bangerter to pull free.

---

[3] This evidence was not admitted for its truth, but for its effect on Deputy Bangerter.

Defendant then took a fighting stance with one leg back and his arms up. Bangerter also took a fighting stance and reached for his sidearm, at which time defendant took off down the street. Bangerter chased after defendant until he lost sight of him. At that point, Bangerter stopped and waited for backup to arrive. His glasses had been knocked off during the struggle, his radio was hanging askew, and he had a wrist injury.

Corporal Rodriguez testified that he and another deputy arrived at the same time in separate vehicles. Bangerter was in the road with his flashlight. Bangerter was disheveled and his eyeglasses were missing, and he reported that defendant fought with him and then ran off.

After backup arrived and a perimeter was established with the aid from the California Highway Patrol and Madera Police Department, Bangerter returned to the residence to talk to Maria. She brought out a 20-gauge shotgun from the house and handed it to him.

Rodriguez spoke with Maria and her sister, I.P., who also lived in the house. Both were upset, and Maria was crying. Maria told Rodriguez she was in bed with the children when defendant entered and pointed a gun at her. Her sister then entered the room and saw what was happening. Maria managed to dial 911 when defendant was distracted by her sister, and she gave the phone to her niece to complete the emergency call. Maria told Rodriguez that there were texts messages on defendant's locked phone, which he left behind in the house, stating he was going to kill her.[4]

Maria's preliminary hearing testimony was read into the record. She stated that she and defendant had been together for 13 years and lived together. On the night of the

---

[4] Some of Corporal Rodriguez's testimony regarding what Maria told him, which was very brief, came in during recross-examination without any objection from the prosecutor. The trial court admitted the remainder during redirect examination as, it appears, a prior consistent statement. (Evid. Code, §§ 1236, 791.)

incident, she was in bed with the children when defendant turned on the light, pointed a gun at her, and said he was going to kill her. Defendant accused her of being with someone else and not wanting to be with him anymore. Maria was afraid and disappointed in him, and she feared the children would be hurt, but she did not know if defendant would actually harm her. She testified they had argued that day and the relationship was strained, but he only struck her one time, approximately a year earlier.

## II. Defense Case

Defendant admitted he had a prior conviction for an incident of domestic violence. He denied he threatened Maria that night or had a weapon. He said they exchanged words regarding her phone, and he last saw the gun about 10 days earlier.

Regarding the incident with Bangerter, defendant testified that when he exited the house the first time, he saw Bangerter and went back inside to ask why the police were there and who called them. He stated that after he came back out, Bangerter did not allow him to speak and did not tell him anything about following instructions.

## DISCUSSION

## I. Admission of Maria's Preliminary Hearing Testimony

### A. Background

Maria testified during the preliminary hearing held on February 21, 2020.[5] At the time, she was still living at the Madera property, where she had lived for 13 years. After the prosecutor asked her several questions, she stated she did not want to testify, but she cooperated when the trial court ordered her to do so.

Jury trial was scheduled for April 28th. On April 20th, trial was continued to June 9th, and on May 18th, trial was continued to June 30th. On June 19th, the prosecutor filed motions in limine and a witness list that included Maria and her sister,

---

[5] All further date references in part I. of the Discussion are to the year 2020.

6.

I.P., with a location of Madera, California. Trial commenced on June 30th, and after two days of jury selection, there was a two-week break in the trial.

On day three of trial, July 14th, the trial court stated it was in receipt of the prosecutor's supplemental motion in limine to admit a transcript of Maria's prior testimony, filed the previous day. In the motion, the prosecutor stated that Maria had fled the state and her location was unknown. Defendant objected on the ground that there was no due diligence shown, and that Maria was not unavailable.

The next day, Manuel Ruiz, an investigative assistant with the district attorney's office, testified regarding his attempts to serve Maria. Ruiz testified that he previously served Maria successfully at her residence in Madera, most recently on April 8th, in advance of the trial then scheduled for April 28th. Subsequently, between May 19th and July 13th, Ruiz made 15 attempts to serve Maria at her residence, all of which were unsuccessful. Ruiz testified that no one was home, although it appeared people were living there, and the black car he knew Maria drove was never there, day or night. Neighbors confirmed Maria and I.P. lived there, however.

Between June 10th and July 11th, no service attempts were made, although Ruiz was checking databases, which returned the Madera address. Ruiz began to ask neighbors about Maria, and on or around July 10th, he learned from one that Maria had moved more than a month before. On July 13th, Ruiz served I.P., and she told him that Maria had moved to Oregon approximately one month earlier and was living with family members. I.P. did not provide an address for Maria. During the course of attempting to locate Maria, Ruiz searched three public databases utilized by the district attorney's office, but none provided an address for Maria other than the residence in Madera.

After taking the matter under submission, the trial court ruled that Maria was unavailable and admitted the transcript of her preliminary hearing testimony. Subsequently, prior to the commencement of evidence, defendant's housing unit at the jail was placed on quarantine for two weeks due to a COVID-19 outbreak. On

7.

August 10th, trial resumed, at which time defendant renewed his objection to the use of Maria's preliminary hearing testimony. He pointed out that due to the delay in trial, the prosecutor had an additional four weeks to locate Maria, and he asked the court to exclude her prior testimony. The trial court declined to change its previous ruling. The court stated that Ruiz had confirmed Maria moved out of state and he did not locate her, and the court noted that it would have been difficult to get Maria back to California in such a short period of time.

Defendant claims the trial court erred in finding Maria was an unavailable witness because the prosecutor failed to exercise due diligence in attempting to locate her. Specifically, defendant faults the prosecutor for failing to again attempt service at the Madera residence and check the databases between mid-July and mid-August, when trial resumed after the jail quarantine ended. He also argues that to the extent the trial court assumed Maria's location in Oregon rendered her unavailable, it engaged in speculation and its conclusion was error under the law given the availability of the Uniform Act (§ 1334 et seq.) to attempt to compel an out-of-state witness's attendance. (See *People v. Cogswell* (2010) 48 Cal.4th 467, 474–475 [discussing Uniform Act].)

The People, relying on the California Supreme Court's decisions in *Fuiava* and *Wilson* as analogous, contend there was no error. (*People v. Fuiava* (2012) 53 Cal.4th 622 (*Fuiava*); *People v. Wilson* (2005) 36 Cal.4th 309 (*Wilson*).)

Following our independent review of the record (*Sanchez, supra*, 63 Cal.4th at p. 440), we conclude that the prosecutor failed to meet his burden of demonstrating due diligence and, therefore, the trial court erred when it found Maria unavailable and admitted her preliminary hearing testimony. Because Maria's testimony was critical to defendant's conviction on count 1, the error was prejudicial and requires reversal of the conviction for attempted criminal threats.

**B.     Legal Standard**

The applicable legal standard is well established.  "A criminal defendant has the right under both the federal and state Constitutions to confront the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.)  This right, however, is not absolute. The high court [has] reaffirmed the long-standing exception that '[t]estimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.'  (*Crawford v. Washington* (2004) 541 U.S. 36, 59; see *People v. Cromer* (2001) 24 Cal.4th 889, 892 [(*Cromer*]).)  Evidence Code section 1291 codifies this traditional exception.  (*People v. Alcala* (1992) 4 Cal.4th 742, 784–785.)  When the requirements of Evidence Code section 1291 are met, 'admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution.  [Citations.]'  (*People v. Mayfield* (1997) 14 Cal.4th 668, 742.)

"Evidence Code section 1291, subdivision (a)(2), provides that former testimony is not rendered inadmissible as hearsay if the declarant is 'unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.'  In turn, Evidence Code section 240, subdivision (a)(5), states a declarant is 'unavailable as a witness' if the declarant is '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process.'"  (*Wilson, supra*, 36 Cal.4th at pp. 340–341.)

"In a criminal case, the prosecution bears the burden of showing that the witness is unavailable and, additionally, that it made a 'good-faith effort' (*Barber v. Page* (1968) 390 U.S. 719, 725) or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial."  (*Sanchez, supra*, 63 Cal.4th at p. 440, citing *Cromer, supra*,

9.

24 Cal.4th at p. 892 & *People v. Valencia* (2008) 43 Cal.4th 268, 291–292.)  "'[T]he term "due diligence" is "incapable of a mechanical definition," but it "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character."'  (*Cromer, supra*, 24 Cal.4th at p. 904.)  Relevant considerations include the timeliness of the search, the importance of the witness's testimony, and whether leads were competently explored.  (*Ibid.*)  The reviewing court defers to the trial court's determination of the historical facts if supported by substantial evidence, but it reviews the trial court's ultimate finding of due diligence independently, not deferentially."  *(Sanchez, supra*, 63 Cal.4th at p. 440, citing *People v. Bunyard* (2009) 45 Cal.4th 836, 851 (*Bunyard*) & *Cromer, supra*, at pp. 900–901.)

### C.    Analysis

#### 1.    Error

As an initial matter, the People correctly contend that "'[t]he prosecution is not required "to keep 'periodic tabs' on every material witness in a criminal case ....'"'" (*People v. Friend* (2009) 47 Cal.4th 1, 68, quoting *Wilson*, *supra*, 36 Cal.4th at p. 342.) However, "when there is knowledge of  'a "substantial risk"' that an '"important witness would flee,"' the prosecutor is required to '"take adequate preventative measures" to stop the witness from disappearing.'" (*People v. Friend, supra*, at p. 68, quoting *Wilson, supra*, at p. 342.)

Maria stated at the preliminary hearing that she did not want to testify, but she did so when ordered by the court.  Almost two months later, on April 8th, Ruiz succeeded in serving Maria at her Madera residence in advance of jury trial then set for the end of April.  At this point, nothing in the record suggests the prosecutor should have been on notice of a substantial risk Maria would flee and defendant does not contend otherwise.

The trial date was subsequently continued first to June 9th and then to June 30th. Between May 19th and June 10th, Ruiz attempted to serve Maria on 12 occasions, without success.  The Madera residence appeared occupied, but no one was home,

10.

Maria's car was not there, and database checks did not reveal any other address for Maria.

The prosecution only intended to call four witnesses, Deputy Bangerter, Corporal Rodriguez, Maria, and I.P. Maria's testimony, as the victim, was critical to proving the criminal threats charge. (§ 422, subd. (a); *People v. Choi* (2021) 59 Cal.App.5th 753, 761 [setting forth elements, which include actual fear for safety caused by threat].) For this reason, Ruiz's inability to serve Maria by mid-June, despite 12 attempts at her known address, should have been cause for concern for the prosecutor. As discussed below, a prosecutor does not have to exhaust every possible informational avenue, but he or she must make more than a perfunctory attempt to locate the witness. In this case, for example, defendant and Maria shared two school-aged children, but there is no evidence in the record that any attempt was made to check their enrollment in school locally, which might have confirmed Maria's continued presence in Madera and allowed for her location. Further, the prosecutor did not present any evidence regarding attempts to reach Maria by telephone or to involve additional law enforcement in the search. There is also no evidence regarding whether Maria was employed and, if so, whether any attempt was made to contact her at work.

Following his unsuccessful June 10th attempt, Ruiz next attempted to serve Maria on July 10th, during the two-week break between day two and day three of trial, prior to the commencement of evidence. It appears it was at this point Ruiz first obtained information that Maria had moved out of state. Three days later, I.P. told Ruiz that Maria was living with relatives in Oregon.

During the hearing on the prosecutor's motion to admit Maria's prior testimony, the trial court asked, "They were unable to give you an address in Oregon?" Ruiz responded, "She didn't give me an address, no, Your Honor." It is unclear from this exchange whether Ruiz asked I.P. for the address and she refused to provide it, or whether she simply did not volunteer it. Further, there is no evidence that Ruiz asked

11.

with which relatives Maria was living in Oregon, for the relatives' names, or for a telephone number to reach Maria. Given that Maria and I.P. are sisters who lived together at the Madera property, and that I.P. personally provided the information that Maria was living with family members in Oregon, this lapse is particularly notable.

It is possible that additional avenues were explored, and deficiencies simply lie with the record made. We note that in his supplemental motion in limine, the prosecutor stated Maria refused to return phone calls or provide a current address, and "multiple members" of her family told Ruiz she fled and was living at an unknown address. However, there was no testimony to this effect and the prosecutor did not introduce any evidence other than Ruiz's testimony. As such, we cannot tell whether the prosecutor overstated his case in the motion or instead failed to make an adequate record at the hearing. (*People v. Saelee* (2018) 28 Cal.App.5th 744, 755 [statements of fact and arguments in court filing not evidence]; accord, *Hebberd-Kulow Enterprises, Inc. v. Kelomar, Inc.* (2013) 218 Cal.App.4th 272, 283.) Whatever the explanation, the burden of proof rested with the prosecutor.

"'The purpose of the due diligence requirement is to ensure that the prosecution has made all reasonable efforts to procure the presence of the witness before the defendant is denied the opportunity to confront him'" (*Bunyard, supra*, 45 Cal.4th at p. 853), and the importance of the witness's testimony bears on the evaluation of reasonableness (*People v. Wilson* (2021) 11 Cal.5th 259, 293; *Sanchez, supra*, 63 Cal.4th at p. 442; *Fuiava, supra*, 53 Cal.4th at pp. 676–677). Maria's testimony was not cumulative of other evidence nor did her testimony relate to a collateral matter. To the contrary, the prosecutor's ability to prove count 1 rested on Maria's testimony, and the prosecutor was on notice by early June that Ruiz had repeatedly attempted to serve her without success. Despite the fact Maria was one of only four witnesses the prosecutor intended to call and her testimony was critical, there is no evidence in the record that any steps were taken beyond visits to the Madera residence and database searches. (See

12.

*Sanchez, supra*, at p. 442 ["In a case … with dozens of witnesses, there is a limit to what one can expect the prosecution to do to procure the attendance of a noncritical witness."].)

In July, Ruiz obtained information that Maria was living with relatives in Oregon, but as previously set forth, there is no evidence he asked any follow-up questions. Specifically, the record does not contain evidence that I.P., who was in a position to know where Maria was, refused to provide any further information on Maria's specific location or her contact information. The law does not require the prosecutor to perform acts of futility (*People v. Herrera* (2010) 49 Cal.4th 613, 630–631; *People v. Smith* (2003) 30 Cal.4th 581, 611), but the failure to explore competent leads is relevant in determining whether the prosecution, reasonably and in good faith, attempted to secure a witness's presence (*Fuiava, supra*, 53 Cal.4th at p. 677). Given the importance of Maria's testimony, the prosecution's failure to take any steps beyond visiting the Madera residence and checking databases, coupled with its subsequent failure to follow up on the new information provided by I.P., does not suffice to demonstrate due diligence in attempting to locate Maria. (*Cromer, supra*, 24 Cal.4th at pp. 903–904 [no due diligence where "serious efforts to locate [witness] were unreasonably delayed, and investigation of promising information was unreasonably curtailed"]; *People v. Louis* (1986) 42 Cal.3d 969, 992–993 [where prosecutor did not obtain and verify address where witness said he would be staying, and keep him under surveillance, "failure to take such minimal action plainly conflicts with the claim that the prosecution exercised due diligence"].)

The People rely on *Fuiava* and *Wilson* for support, but in *Fuiava*, the witness's testimony was not of critical importance and neither case involved a lead on the witness's location that was left unexplored. (*Fuiava, supra*, 53 Cal.4th at pp. 676–677; *Wilson, supra*, 36 Cal.4th at pp. 341–342.) We find the California Supreme Court's decision in *Cromer* more instructive on the facts of this case. (*Cromer, supra*, 24 Cal.4th at pp. 892–893, 905.)

13.

In *Cromer*, the defendant was charged with three counts of robbery with personal use of a firearm, and the victim in the third count testified at the preliminary hearing, but failed to appear for trial. (*Cromer, supra*, 24 Cal.4th at p. 893.) The high court found the prosecutor failed to show due diligence where the investigators were told two days before trial that the victim was living with her mother. (*Id.* at p. 904.) The prosecution waited two more days before an investigator obtained the victim's mother's address from the Department of Motor Vehicles and drove to her house. (*Id.* at pp. 903–904.) The investigator was informed the victim did not live there and her mother was not home but would be returning the next day. (*Id.* at p. 904.) The investigator left a subpoena for the victim, but did not return, never spoke with the victim's mother, and never tried to obtain a work address or telephone number for the victim's mother. (*Ibid.*)

More recently, the court summarized the caselaw as follows: "[I]n those cases in which courts have not found adequate diligence, the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent. [Citations.] On the other hand, diligence has been found when the prosecution's efforts are timely, *reasonably extensive* and carried out over a reasonable period." (*Bunyard, supra*, 45 Cal.4th at pp. 855–856, italics added.)

The trial court perhaps had concerns regarding the prosecutor's diligence in this case, as it made a more complete record than that created by the parties through its own questioning of Ruiz. However, it is incumbent on the prosecutor to make the requisite showing of sufficient effort. "[T]he fact '*additional* efforts might have been made or other lines of inquiry pursued does not affect [a finding of reasonable diligence],'" *if* reasonable efforts to find the witness were employed. (*People v. Royal* (2019) 43 Cal.App.5th 121, 136, italics added, quoting *People v. Cummings* (1993) 4 Cal.4th 1233, 1298, abrogated on another ground by *People v. Merritt* (2017) 2 Cal.5th 819, 831; accord, *Fuiava, supra*, 53 Cal.4th at p. 677; *Wilson, supra*, 36 Cal.4th at p. 342.) Here, given the minimal efforts undertaken and what appears from the record to be a complete

14.

failure to pursue the new information obtained in July, balanced against the importance of Maria's testimony, the prosecutor fell short of meeting his burden and the trial court erred in concluding otherwise.

### 2. Prejudice

The People do not argue that any error was harmless nor could they. ""'"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24." [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.'" (*People v. Loy* (2011) 52 Cal.4th 46, 69–70.)" (*People v. Livingston* (2013) 53 Cal.4th 1145, 1159; accord, *People v. Louis, supra*, 42 Cal.3d at pp. 993–994.) "'The burden is on the beneficiary of the error "either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment."'" (*People v. Louis,* at pp. 993–994, quoting *People v. Stritzinger* (1983) 34 Cal.3d 505, 520; accord, *People v. Wycoff* (2021) 12 Cal.5th 58, 93.)

Maria's testimony was crucial to proving count 1. Other than Maria, Deputy Bangerter, and Corporal Rodriguez, the prosecutor intended to call I.P. However, I.P. not only failed to appear for trial, but she was not a victim, which left only Maria's preliminary hearing testimony supporting defendant's conviction for attempted criminal threats. Thus, the error in admitting Maria's prior testimony was clearly prejudicial and defendant's conviction on count 1 must be reversed.

## II. Instructional Error

With respect to count 2, defendant claims the trial court erred when it refused his request to instruct the jury on resisting an officer without force or violence under section 148, subdivision (a)(1), as a lesser included offense of section 69, subdivision (a). The People contend that there was no error because the instruction was not supported by substantial evidence. As set forth below, the trial court's reasoning for denying the

request was incorrect, but, as the People state, there was not substantial evidence to support the instruction and, therefore, no error.

### A.  Legal Standard

"'A trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury.' (*People v. Halvorsen* (2007) 42 Cal.4th 379, 414, fn. omitted.)  The obligation to give an instruction on lesser included offenses exists even when a defendant expressly objects to it.  (*People v. Souza* (2012) 54 Cal.4th 90, 114.)" (*People v. Nieves* (2021) 11 Cal.5th 404, 463.)

We review the trial court's decision de novo.  (*People v. Nieves, supra*, 11 Cal.5th at p. 463; accord, *People v. Licas* (2007) 41 Cal.4th 362, 366.)

### B.  Analysis

#### 1.  Section 148 a Lesser Included Offense of Section 69 Under Accusatory Pleading Test

"'[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser.  [Citations.]' (*People v. Birks* (1998) 19 Cal.4th 108, 117–118.)" (*People v. Licas, supra*, 41 Cal.4th at p. 366.)  Section 69, subdivision (a), can be violated in two separate ways, and section 148, subdivision (a)(1), is a lesser included offense under one of the two ways.  (*People v. Smith* (2013) 57 Cal.4th 232, 242 (*Smith*); accord, *People v. Kruse* (2020) 56 Cal.App.5th 1034, 1044.)

Section 69 provides, in relevant part, "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon the officer by law, *or* who knowingly resists, by the use of force or violence, the officer, in the performance of his or her duty, is punishable by a fine not exceeding ten thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h)

16.

of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment." (*Id.,* subd. (a), italics added.)

Section 148 provides, in relevant part, "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, as defined in Division 2.5 (commencing with Section 1797) of the Health and Safety Code, in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment." (§ 148, subd. (a)(1).)

In *Smith*, the California Supreme Court explained that section 148, subdivision (a)(1), is a lesser included offense of section 69 violated the second way, but not the first way (*Smith, supra*, 57 Cal.4th at pp. 241–242), and where the accusatory pleading alleges section 69 was violated the second way, section 148, subdivision (a)(1), is a lesser included offense (*Smith, supra*, at pp. 242–243). In this case, the information alleged defendant committed a violation of section 69 in both ways, but the prosecutor proceeded only on the theory that defendant violated the statute the second way, knowingly resisting an officer by use of force or violence, and the jury was instructed only on that theory, in accordance with CALCRIM No. 2652.

The court denied defendant's request for an instruction on section 148, subdivision (a)(1), on the ground it was not a lesser included offense of section 69. This was incorrect under the circumstances of this case (*Smith, supra*, 57 Cal.4th at p. 242), but "'"we review the ruling, not the court's reasoning and, if the ruling was correct on any ground, we affirm."'" (*People v. Brooks* (2017) 3 Cal.5th 1, 39.)

### 2.    Instruction Not Supported by Substantial Evidence

There is no duty "to instruct the jury on a necessarily included lesser offense '"when there is no evidence that the offense was less than that charged."'" (*Smith, supra*, 57 Cal.4th at p. 245, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 154.)

17.

Substantial evidence supporting the instruction means "'"'"evidence that a reasonable jury could find persuasive'" [citation], which, if accepted, "'would absolve [the] defendant from guilt of the greater offense' [citation] *but not the lesser*" [citation].' (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.)" (*People v. Licas, supra*, 41 Cal.4th at p. 366.)

Only Deputy Bangerter and defendant testified regarding the interaction between them. Bangerter described in detail the physical struggle between the two, his attempts to gain control over and detain defendant, and defendant's actions in attempting to break away, encircling Bangerter's waist, and attempting to knock Bangerter off his feet. Bangerter testified he lost his glasses during the struggle, his radio microphone was dislodged and knocked out of his reach, and he tore a tendon in his wrist, causing him to miss work for the month of November 2019. Although Corporal Rodriguez did not witness the struggle, he testified that when he arrived, Bangerter was disheveled, his eyeglasses were missing, and his radio was askew.

When defendant testified, he admitted he saw Bangerter and knew Bangerter was a law enforcement officer. He denied he threatened Maria that night or had a firearm, but with respect to his contact with Bangerter, he testified only that Bangerter did not give him the opportunity to speak and did not tell him to follow instructions. Defendant did not otherwise offer any testimony regarding their interaction or his actions.

Under these circumstances, there was not substantial evidence that defendant committed only the lesser included offense of resisting an officer without force or violence. If the jury credited Bangerter's testimony, which the verdict reflects it did, defendant necessarily resisted with force or violence. Defendant argues that his "alleged violence or force was ambiguous," and whether or not the evidence "rose from the level of passive resistance to the element of force was a question for the jury." However, "'[s]peculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 717.) "'"'"Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence

18.

that a reasonable jury could find persuasive."'"" [Citation.]'" (*Ibid.*) Accordingly, we reject defendant's claim that the trial court's failure to instruct the jury on section 148, subdivision (a)(1), was error, and we need not consider his argument of prejudice.

## III.    Credit Calculation Error

Next, the parties agree that the trial court erred when it only awarded defendant four days of actual custody credit and four days of conduct credit, for a total of eight days. They also agree that defendant is entitled to 49 additional days of actual credit. Based on the record, we concur that there appears to be a calculation error. It also appears that the parties' figure includes the four days of actual credit already awarded by the trial court and that defendant may be entitled to additional conduct credit. Given the incomplete record on the matter, discussed next, remand for recalculation is required.

### A.    Procedural Background

Defendant was arrested on November 3, 2019, and sentenced to state prison in this case on September 18, 2020. In between those dates, on June 29, 2020, he was sentenced to 180 days in jail in Madera Superior Court case No. CCR061093[6] and to a consecutive term of 364 days in jail in case No. MCR061451, for a total of 544 days.

The probation report listed the sentencing date as September 20, 2020, with 323 days of actual credit and 322 days of conduct credits, for a total of 645 days. This was error given that sentencing occurred on September 18, 2020. The supplemental probation report prepared eight days later provided that defendant was entitled to four days of actual credit and four days of conduct credit in this case, for a total of eight days for the period of November 3, 2019, through November 6, 2019. The report attributed the remaining credits for the period of November 7, 2019, to September 10, 2020, to case No. MCR061451. In addition to the erroneous sentencing date, defendant was only sentenced to 364 days in case No. MCR061451, leaving excess credits remaining.

---

**6**    Further references to case numbers are to Madera Superior Court case numbers.

19.

Trial counsel brought the calculation error to the trial court's attention, stating that defendant should have approximately 100 days of credit available to apply in this case. The court disagreed and credited defendant only the aforementioned eight days. Counsel did not pursue the matter and apparently did not follow up with a modification request after sentencing, as invited by the court.

## B. Remand Required for Recalculation

"'Penal Code section 2900.5 imposes on the sentencing court the obligation to determine the number of days of custody *and, in those cases to which it expressly applies, conduct credit to which the defendant is entitled ….*'" (*People v. Superior Court (Frezier)* (2020) 54 Cal.App.5th 652, 660–661, quoting *People v. Sage* (1980) 26 Cal.3d 498, 508–509.) "Under section 4019, '[i]n addition to actual credit … detainees in local institutions are usually able to earn credit against their eventual sentence for good behavior and work performed.'" (*Frezier, supra*, at p. 661, quoting *People v. Brown* (2020) 52 Cal.App.5th 899, 902–903.) Relevant in this case, these conduct credits are available for those inmates confined in county jail from the date of arrest to imposition of sentence for a felony conviction and for those misdemeanants serving a jail sentence. (§ 4019, subd. (a)(1); *People v. Sage, supra*, at pp. 503–504.) "[F]or each four-day period in which a prisoner is confined and has been on good behavior, the prisoner will receive two days of conduct credits (§ 4019, subds. (b), (c); see also *People v. Dieck* (2009) 46 Cal.4th 934, 939, fn. 3)," and "'a term of four days will be deemed to have been served for every two days spent in actual custody.' (§ 4019, subd. (f).)" (*Frezier, supra*, at p. 661, fn. omitted.)

We observe that "[s]ection 2933.1, subdivision (c), … limits presentence conduct credit '[n]otwithstanding Section 4019 or any other provision of law' to '15 percent of the actual period of confinement' where a defendant is convicted of a felony offense listed in subdivision (c) of section 667.5." (*People v. Jacobs* (2013) 220 Cal.App.4th 67, 79; accord, *In re Mallard* (2017) 7 Cal.App.5th 1220, 1225–1226; *People v. Andrade*

(2015) 238 Cal.App.4th 1274, 1310–1311.)  Although not mentioned in the probation report or by the parties on appeal, defendant's felony conviction in count 1 for attempted criminal threats, now reversed, qualified as a violent felony by virtue of the firearm enhancement under section 12022.5.  (§ 667.5, subd. (c)(8); *People v. Ramos* (1996) 50 Cal.App.4th 810, 815.)  This limitation is potentially relevant to a future credit recalculation, depending on the People's election regarding count 1 and the subsequent outcome.

The parties here agree that defendant was entitled to 321 days of actual credit and the probation report reflected entitlement to full conduct credit, which, based on correction to the sentencing date, was 320 days.  Defendant was sentenced to a total of 544 days in jail in cases Nos. CCR061093 and MCR061451, and the trial court credited him a total of eight days in this case.  Assuming entitlement to full conduct credit, it appears defendant may be entitled to an additional 89 days of credit in this case.  However, it also appears defendant may have had at least one other matter pending, case No. MCR064858.  It is unclear what effect, if any, that may have had on the trial court's credit calculation, and we cannot discern from the record whether there may be other limitations relevant to an award of credits in this case.  Therefore, while we accept the People's concession of error in this case, remand is required for recalculation.

IV.    **Abstract of Judgment**

Finally, "[a]ny discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error."  (*People v. Leon* (2020) 8 Cal.5th 831, 855, citing *People v. Mesa* (1975) 14 Cal.3d 466, 471.)  We may order correction on review.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185, citing *In re Candelario* (1970) 3 Cal.3d 702, 705.)

The parties agree, and our review confirms, that the minute order from the sentencing hearing and the abstract of judgment incorrectly reflect, one, imposition of a firearm enhancement under subdivision (b) of section 12022.5 rather than subdivision (a)

21.

and, two, imposition of a $750 presentence report fee.  The error as to the firearm enhancement subdivision is moot in light of the reversal on count 1.  As for the now-repealed $750 presentence report fee, which was not imposed in this case, the trial court shall correct its records and amend the abstract of judgment to omit the fee.

## DISPOSITION

Defendant's conviction on count 1 for attempted criminal threats with an attached firearm enhancement is reversed and the matter is remanded for further proceedings.  If, after the filing of the remittitur in the trial court, the People do not bring defendant to retrial on count 1 within the time limit of section 1382, subdivision (a)(2), the trial court shall resentence defendant on count 2.  At the appropriate juncture depending on the People's election and any further proceedings, the trial court must recalculate the presentence credits due defendant, and forward an amended abstract of judgment to the appropriate authorities omitting the $750 presentence report fee.


                                                                                    MEEHAN, J.

WE CONCUR:



LEVY, Acting P. J.



DeSANTOS, J.